UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PATRICIA WAGNER

7707 Wisconsin Ave
Bethesda, MD 20815
(Montgomery County)
                             Plaintiff

v.                                CIVIL ACTION NO.:

MINUTECLINIC, LLC
D/B/A CVS MINUTECLINIC

One CVS Drive
Woonsocket, Rhode Island 02895

                         Defendant

## COMPLAINT

Comes now the Plaintiff, Patricia Wagner, by and through undersigned counsel, and hereby files the instant Complaint against Defendant, MinuteClinic, LLC d/b/a CVS MinuteClinic under Maryland law.

## INTRODUCTION

This case is primarily about a 61 year old Nurse Practitioner's attempts to save lives during the COVID-19 pandemic and to put patient safety and the health of her colleagues ahead of corporate profit during one of the worst medical crises to hit this United States in the last century. In early 2020, CVS MinuteClinics were a recipe for a COVID-19 stew of super-spreader events: the clinics are small, built-in or retrofitted into CVS stores, with little to no ventilation and no room for social distancing. When Patricia Wagner, a former CVS MinuteClinic Nurse Practitioner with almost 40 years' of experience attempted to take measures

1

at her Bethesda, Maryland MinuteClinic to slow the spread of COVID-19 and protect CVS's patients and customers – her supervisors tried to stop her and issued her reprimands.   On April 25, 2020, it was clear that Ms. Wagner's fears were warranted, as a COVID-19 patient almost died on a MinuteClinic table.  Thankfully, Ms. Wagner stepped in and saved the man's life.

After this incident, Ms. Wagner's supervisors could not risk Ms. Wagner remaining employed by CVS after Ms. Wagner had repeatedly complained that MinuteClinic patients were in danger from CVS's failure to implement COVID-19 safety protocols.   Thus, no longer the beloved nine (9) year CVS veteran with dozens upon dozens of glowing reviews from patients and customers, Ms. Wagner became her supervisors scapegoat and (days after saving a COVID-19 patient's life) was told to "pack her things"  was fired from CVS.

A front-line hero, Ms. Wagner was fired, without health insurance, at the age of 60 in the middle of the COVID-19 pandemic.  Ms. Wagner herein brings this lawsuit against CVS under state and federal law alleging damages suffered as the result of CVS's actions.

## THE PARTIES

1.    Patricia Wagner (hereinafter referred to as "Plaintiff") is a resident of the state of Maryland.

2.    Plaintiff currently resides at 7707 Wisconsin Ave, Bethesda, MD 20814

3.    At all times relevant to this complaint, Plaintiff has been a resident of the state of Maryland.

4.    Plaintiff is over the age of sixty (60).

5.    Defendant, MinuteClinic, LLC is a wholly owned subsidiary of CVS Pharmacy, Inc. (Herein referred to as "Defendant," "MinuteClinic" or "CVS")

6.     Upon information and belief,  Defendant owns and operates over a thousand "clinics" around the United States located in CVS retail locations.

7.     Upon information and belief, Defendant owns and operates over 20 MinuteClinic locations in the State of Maryland.

8.     Defendant's corporate headquarters are located in Woonsocket, Rhode Island.

9.     Defendant's principal place of business is located in Woonsocket, Rhode Island.

10.    Defendant is doing business in the State of Maryland under the trade name CVS MinuteClinic.

11.    Defendant's parent corporation, CVS Pharmacy, Inc., is a wholly owned subsidiary of CVS Health Corporation.

12.    Defendant is a wholly owned subsidiary of CVS Pharmacy, Inc.

13.    CVS Health Corporation wholly owns CVS Pharmacy, Inc. and Defendant, MinuteClinic, LLC.

14.    CVS Health Corporation is a multinational company with annual revenues of approximately $300billion.

15.    CVS Health Corporation has approximately 300,000 employees.

16.    CVS is the fifth largest corporation in the United States.

17.    Defendant sells millions of dollars in pharmaceuticals, clinic services and other products to Maryland residents and in the state of Maryland.

## **JURISDICTION**

18.    The United States District Court for the District of Maryland has jurisdiction over this matter.

19.    At all times relevant to this complaint, Plaintiff was employed by Defendant in the state of Maryland.

20. At all times relevant to this complaint, Plaintiff was a resident of the state of Maryland.

21. The employment actions and decisions described in this Complaint substantially occurred in Maryland.

22. The United States District Court for the District of Maryland has diversity jurisdiction over this matter pursuant to 28 U.S.C. §1332.

23. There is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

24. The United States District Court for the District of Maryland also has original jurisdiction over this matter pursuant to 28 U.S.C. §1331.

25. The United States District Court for the District of Maryland has supplemental jurisdiction over Plaintiff's Maryland state law claims pursuant to 28 U.S.C. §1367, as the claims are so related to the claims in the action within the original jurisdiction of this court that they form part of the same case or controversy.

## **<u>FACTS</u>**

26. Defendant is a for profit urgent care clinic owned by CVS which describes itself as a "MinuteClinic."

27. Defendant is a freestanding medical clinic that purports to provide a suite of medical services to CVS customers and the Maryland public.

28. Defendant maintains their MinuteClinic operations inside CVS retail locations.

29. Generally speaking, the MinuteClinic area is housed in a small room in CVS retail locations.

30.   Generally speaking, the MinuteClinic area is a compact, non-ventilated area that is much smaller and enclosed than other comparable free-standing urgent care clinics.

31.   MinuteClinic's business is designed to draw in CVS retail customers while shopping at CVS retail stores or from the general Maryland public to obtain health services from the MinuteClinic.

32.   Although MinuteClinic offers more limited services than physician's offices and a number of urgent clinics, MinuteClinic staff are encouraged to "capture visits" from CVS customers and the general public for "evaluation" to receive co-pay, insurance revenue and out of pocket expenses.

33.   MinuteClinic staff are instructed to capture these visits even when the MinuteClinic staff are aware that the MinuteClinic does not provide the services that the CVS customer or prospective patient needs to resolve or evaluate their health issue.

34.   For example, if a CVS customer calls the MinuteClinic and complains of a broken wrist requiring an x-ray to properly diagnose, MinuteClinic staff are instructed to pursue the customer for an in-person visit even though MinuteClinic does not provide x-rays and is already aware that MinuteClinic will refer the prospective patient to another facility for an x-ray.  CVS MinuteClinic staff are instructed not to disclose to the customer that the MinuteClinic will not be able to provide necessary services.

35.   By engaging in these business practices, the MinuteClinic "captures" the visit, bills the insurance and the patient, even though MinuteClinic knows that the Patient will

need to be re-evaluated and/or receive an x-ray at another location for an additional fee.

36. This process is repeated with respect to a number of other consultations, evaluations and medical services.

37. CVS Pharmacy Number 1831 (CVS MinuteClinic 1831) is located at 7809 Wisconsin Ave, Bethesda, MD 20814.

38. Like many CVS locations after CVS's merger with Aetna, Inc. (one of the largest health insurers in the United States), CVS Store 1831 has a MinuteClinic area that has been built into the general retail pharmacy space.

39. Store 1831's MinuteClinic space, like most CVS MinuteClinic areas retrofitted around the time of CVS's merger with Aetna, is extremely small and has room for only a few patients and staff.

40. The MinuteClinic area is similar to the size of a break-room.

41. In a pre-COVID world, this may have been acceptable.

42. But in a post-COVID world where patients must remain six feet a-part, staff must take precautions for their own safety and the safety of patients, CVS customers and retail colleagues – the MinuteClinic model is seriously flawed.

43. Plaintiff, Patricia Wagner, is a 60 year old former CVS MinuteClinic Nurse Practitioner with almost 40 years' experience in the healthcare industry.

44. As a 60 year old woman, Ms. Wagner made a number of complaints that CVS MinuteClinic was putting the lives, health and safety of CVS MinuteClinic patients and retail customers at risk through its business practices following the COVID-19 outbreak around March-April, 2020.

6

45. Based on these complaints, other complaints by Ms. Wagner and her age, Ms. Wagner's early 30 and 40-something supervisors terminated her employment at the height of the COVID-19 spread.  Since that time, Ms. Wagner has had to scrounge and scrape for employment and to maintain life saving health care coverage that was otherwise provided during her 9 year employment with CVS.  This complaint is a result of CVS's retaliatory and discriminatory actions.

46. Plaintiff was hired by CVS as a Nurse Practitioner in 2011.  For many years, Ms. Wagner received the highest praise for her customer service and professionalism.

47. Ms. Wagner's superior performance prompted dozens upon dozens of MinuteClinic customers to praise her in written reviews.

48. For example, just in the two months of January and February 2020, Ms. Wagner's supervisor, Michelle Hockstra, received customer reviews of Ms. Wagner's performance that included:

   a. "Very Pleased.  Very Helpful! 100% satisfied and grateful."

   b. "Patricia Wagner was very knowledgeable, professional, thorough and friendly.  I had a great experience!"

   c. "The Nurse was incredibly friendly, caring and professional!  Great first experience!"

   d. "Patty was a pleasure to deal with.  Very friendly and professional!"

   e. "Compassion and kindness go together with knowledge.  What else can you wish for?"

49.   For January and February, 2020 there were at least four other customer reviews that similarly lauded Ms. Wagner's professionalism, attentiveness and care for her patients.

50.   By any metric, Plaintiff's performance met CVS's legitimate business expectations for a Nurse Practitioner during the entire course of Plaintiff's employment.

51.   Although Plaintiff has 40 years' of experience and is an expert Nurse Practitioner who is confident in her ability to provide quality patient care; beginning in late 2015 Plaintiff was supervised by a much younger, less experienced manager (Michelle Hockstra) who demonstrated a discriminatory animus towards Plaintiff because of her age.

52.   Ms. Hockstra treated Plaintiff differently with respect to the terms and conditions of her employment as compared to other, younger staff under Ms. Hockstra's supervision.

53.   In or around late 2018 or early 2019, Plaintiff submitted a complaint to Defendant alleging that Ms. Hockstra was harassing her, evidencing Ms. Wagner's reasonable belief that Ms. Hockstra was discriminating against Plaintiff based on Plaintiff's age/years' of experience.

54.   Plaintiff's complaint constituted protected activity under state, local and federal anti-discrimination laws.

55.   Soon after Plaintiff filed her complaint with CVS, the complaint was forwarded to Ms. Hockstra's supervisor, Lexie Leitner.   Upon information and belief, Ms. Leitner is in her late 30s or early 40s.

56.   Ms. Leitner then notified Ms. Hockstra that Plaintiff had complained about her treatment and Ms. Wagner's belief that she was being discriminated against based on her age.

57.   Thereafter, Ms. Hockstra began a retaliatory campaign against Plaintiff.

58.   Ms. Hockstra reprimanded Plaintiff for issues that did not require a reprimand and/or other similarly situated non-complaining employees were not reprimanded.

59.   Ms. Hockstra harassed Plaintiff on Plaintiff's personal cell phone.

60.   Between 2018 and 2020 (when Plaintiff was terminated), Ms. Hockstra routinely shorted Plaintiff's paycheck.

61.   Plaintiff was paid an hourly wage for hours worked.

62.   Although Plaintiff was permitted a "lunch break," due to the patient volumes in the MinuteClinic practice, Plaintiff routinely worked through Plaintiff's lunch break and after the end of the day.

63.   Ms. Hockstra was aware that Plaintiff had worked, on average, an additional two hours per day on a daily basis but that Plaintiff was not compensated for this time.

64.   Plaintiff made multiple requests to Ms. Hockstra and CVS to be compensated for the hours that Plaintiff worked and Ms. Hockstra and/or CVS refused to pay Plaintiff for these hours.

65.   Instead, Ms. Hockstra chastised Plaintiff for working hard.

66.   In January and February 2020, a global respiratory pandemic began sweeping through Asia and Europe.

67.   Before long, the COVID-19 virus had reached American shores and was rapidly progressing.

68.   Although at the time little was known about COVID-19, it was clear that the Novel
      Coronavirus posed a significant and deadly health risk for persons in Plaintiff's
      age bracket as well as CVS MinuteClinic customers, e.g., individuals with
      underlying health conditions.

69.    In or around March 2020, Plaintiff and Plaintiff's physician discovered a
      suspicious mass that had indications of cancer.

70.   As a result, between March 14, 2020 and March 27, 2020, Plaintiff exercised her
      right to Family and Medical Leave Act Leave and/or leave as a reasonable
      accommodation under Maryland and local county law.

71.   Around this same time, the COVID-19 pandemic in the United States reached
      national emergency level proportions.

72.   With rates of infection skyrocketing, on March 11, 2020, the World Health
      Organization announced that COVID-19 was a "pandemic"

73.   On March 13, 2020, President Donald J. Trump issued Proclamation 9994
      declaring a national emergency concerning COVID-19.

74.   Around March 9, 2020, the Occupational Safety and Health Administration issued
      guidance on "preparing Workplaces for COVID-19."

75.   Among other things, OSHA rules and regulations provide that employers must
      perform "hazard assessments" to control health hazards; train employees in the use
      and care of PPE; and comply with various enforcement and guidance regarding the
      use of PPE and operation of N95 masks.

76. As an older employee in the healthcare industry, Plaintiff was among those with the highest risk for contracting and suffering severe complications from COVID-19.

77. Moreover, Plaintiff believed that her MinuteClinic patients, for whom Plaintiff cared deeply, remained at substantial risk for contracting COVID-19 when visiting the MinuteClinic due to the small, non-ventilated area in the CVS store dedicated to MinuteClinic operations.

78. In other words, due to their small size, lack of ventilation and business of treating ill patients in a confined space connected to CVS retail operations, MinuteClinics were a recipe for a disaster stew of COVID-19 super-spreading.

79. In preparation for returning in late March, 2020, Ms. Wagner visited the MinuteClinic store between March 14, 2020 and March 27, 2020 (on her own personal time) to ascertain the level of COVID-19 preparedness and safety precautions that CVS MinuteClinic was implementing to protect staff and patients.

80. The results were shocking.

81. There was no protection in the MinuteClinic separating patients, staff and retail customers/colleagues.

82. There was no plexiglass preventing the transmission of COVID-19 (although CVS had placed such plexiglass in their retail store area).

83. There was no tape or any indication of a "six foot" radius area as recommended and/or required by the CDC as of early March, 2020.

84. There was no ventilation.

85.   There was limited PPE available to the staff.  At times, staff were asked to wear "trash bags."

86.   MinuteClinic had not expanded or altered the treatment area within the CVS retail store to provide for the safety of patients waiting to be seen or being treated by MinuteClinic staff.

87.   When Ms. Wagner came to the store in-between March 14 and March 27, 2020 she told her supervisor that she was there to inspect MinuteClinic's safety protocols and Plaintiff had determined that CVS had not taken adequate steps to safeguard the health and lives of CVS's patients and staff; who were facing substantial and immediate risk by operating under these conditions.

88.   Ms. Hockstra demanded that Plaintiff leave the store until she returned, full-time from Plaintiff's FMLA leave.

89.   When Plaintiff returned from FMLA/Maryland law protected leave, Plaintiff observed that the MinuteClinic had the same safety deficiencies that were putting the health and safety of Plaintiff's patients and colleagues in immediate and substantial danger.

90.   Many of these fears were echoed by CVS patients, customers.  Plaintiff's colleagues also vented their concerns to Plaintiff.

91.   Plaintiff's patients told her that they feared the close interaction with CVS MinuteClinic technicians in the confined MinuteClinic space.  Plaintiff was instructed to dissuade patient's concerns so that they would not leave the MinuteClinic.

92.   Due to MinuteClinic's small, non-ventilated space and confined area and lack of any six-foot separation protocol or dividers, patients and staff were forced to be in proximity that violated CDC requirements and warnings.

93.   As a champion of patient safety and the lead NP in the Bethesda MinuteClinic responsible for patient safety, Ms. Wagner made the decision to implement safety protocols to protect patients and staff.

94.   In or around late March and early April, 2020, Ms. Wagner texted Ms. Hockstra and informed her that the Clinic presented a substantial and immediate danger to public health and safety and notified Ms. Hockstra that she was implementing various safety protocols to address these issues.  For example, Ms. Wagner required patients to remain 6 feet apart from other patients and staff.

95.   In response, Ms. Hockstra reprimanded Ms. Wagner and told her to remove the safety protocols.

96.   By taking these measures, Ms. Hockstra was putting the business and profit needs of CVS ahead of the health and safety of patients, customers, staff and the Maryland public at large.

97.   As another example, CVS had directed the MinuteClinic to use TB-CIDE-QUAT as a cleaner and disinfectant.

98.   However, Ms. Wagner complained that no employees or staff were given the proper training or education on how to use TB-CIDE-QUAT.

99.   Ms. Wagner discovered that improper use, handling and/or exposure to TB-CIDE-QUAT, a pesticide product, posed a substantial health risk to staff and patients due

to carcinogenic risks, risks of disease and risks to individuals with pregnancy or who may become pregnant.

100.  In particular, TB-CIDE-QUAT has been declared by the CDC to increase the risks of miscarriage or preterm birth for pregnant or soon to be pregnant women.

101.  Ms. Wagner complained to Ms. Hockstra that there were no warnings provided to employees or patients regarding the risks and no training about the proper use, handling and storage of TB-CIDE-QUAT.  This was especially troubling to Ms. Wagner as CVS MinuteClinics often evaluate and provide treatment to pregnant women.

102.  Between March and April 28, 2020, Ms. Wagner made multiple complaints to Ms. Hockstra that the CVS MinuteClinic presented an ongoing and serious health risk to patients and staff during the COVID-19 pandemic.

103.  Between March and April 28, 2020, Ms. Wagner made multiple complaints to Ms. Hockstra that CVS was carrying on business as usual and refusing to implement safety protocols, presenting an ongoing and serious health risk to patients and staff.

104.  On April 25, 2020, Ms. Wagner's fears were realized in a very acute way.

105.  On April 25, 2020, while Ms. Wagner was working at the MinuteClinic, a 57 year old man arrived who presented a history of asthma.

106.  The patient complained of coughing, wheezing and shortness of breath lasting for approximately six days.

107.  Ms. Wagner evaluated the patient and the patient had a fever of 102.1 degrees Fahrenheit.

14

108. During Plaintiff's exam of the patient, the patient lost consciousness for 10-15 seconds and Ms. Wagner contacted emergency medical services and notified Suburban Hospital's Emergency Room department of the patient's arrival and her COVID-19 diagnosis.

109. Ms. Wagner had diagnosed that the patient was infected with COVID-19.

110. As a result of the presence of a patient with a life-threatening COVID-19 attack and the substantial and extreme risk that the COVID-19 infected patient presented to the MinuteClinic customers and staff (given CVS's failure to implement necessary safety protocols), Ms. Wagner made emergency decisions to protect the other patients visiting the MinuteClinic.

111. Due to Ms. Wagner's quick reaction, experience and analysis of the situation, the COVID-19 patient was saved.  Later, the patient told Ms. Wagner "As you can tell you make a huge impact not only on the people in your office but your impact their loved one's present and future lives. If I had not met you I would not have gone to the hospital and if that had happened I would not be healthy and gone to work today. My kids have a safer future because of you!"

112. On April 28, 2020, Ms. Hockstra came to the MinuteClinic to talk to Ms. Wagner about the events of April 25, 2020.

113. Again, Ms. Wagner told Ms. Hockstra that she had acted to protect the life and safety of CVS's MinuteClinic patients and staff and these actions were necessitated by CVS's MinuteClinics failure to implement safety precautions during the COVID-19 pandemic.

114. During the meeting, Ms. Hockstra and her supervisor, Ms. Leitner, began bullying and berating Ms. Wagner and were attempting to lay blame on Ms. Wagner.

115. In essence, Ms. Hockstra and Ms. Leitner realized that CVS MinuteClinic and their own inaction had placed CVS patients, staff and the community at risk.

116. The two younger supervisors viewed Ms. Wagner as a 60 year old scapegoat for their own retaliatory actions and inactivity concerning the MinuteClinic and COVID-19 safety.

117. At the conclusion of their meeting where Ms. Hockstra and Ms. Leitner bullied and berated Ms. Wagner, Ms. Hockstra told Plaintiff to "go home."

118. Plaintiff was not told when her next day on the schedule would be or when she would return to the MinuteClinic.

119. On May 7, 2020, Ms. Hockstra told Ms. Wagner, over the phone, that she was terminated from CVS and to "pack her things and leave" the following day, or words to that effect.

120. As a 60 year old woman with no job, no health insurance and no means to support herself in the midst of an ongoing pandemic, Plaintiff feared for her life and safety.

121. Defendant suspended and terminated Plaintiff as a result of Plaintiff's actions and protected activity under the Maryland Wrongful Termination in Violation of Public Policy doctrine and the Maryland Health Care Workers Whistleblower Protection Act.

122. Defendant also suspended and terminated Plaintiff because of Plaintiff's age and prior complaints of discrimination and unlawful employment practices.

123.   Plaintiff has suffered and continues to suffer mental anguish, anxiety, stress and other forms of physical and mental pain and suffering as a result of Defendant's actions.

124.   Defendant's actions have adversely affected the terms and conditions of Plaintiff's employment.

125.   Defendant has acted willfully and maliciously.

126.   Defendant acted intentionally and in disregard of Plaintiff's rights.

127.   Plaintiff has exhausted all administrative remedies prior to filing this suit.

128.   It has been more than 180 days after Plaintiff filed a charge with the EEOC, MCCR and MCOHR.

129.   CVS MinuteClinic has falsely claimed that Plaintiff is subject to a binding arbitration agreement.

130.   During her employment, Plaintiff never received any arbitration agreement.

131.   During her employment, Plaintiff never agreed to any arbitration agreement.

132.   During her employment, Plaintiff was not informed that CVS required her to participate in binding arbitration.

133.   There was no agreement between Plaintiff and Defendant to submit any claims to arbitration.

134.   There is no contract between the parties to submit claims to arbitration.

135.   When CVS provided Plaintiff with a copy of the alleged arbitration agreement for the first time to Plaintiff's attorney, Plaintiff opted out from the arbitration

agreement by mailing a copy of Plaintiff's signed intent to opt-out within 30 days of receipt of CVS's alleged arbitration agreement.[1]

## COUNT I – RETALIATION IN VIOLATION OF MARYLAND CODE, HEALTH OCCUPATIONS §1-502, *et seq.*

136.   Plaintiff hereby adopts and incorporates all aforementioned paragraphs as if herein stated.

137.   At all times relevant to this complaint, Plaintiff has been an individual licensed and/or certified by a Board under the Maryland Code, Health Occupations Article.

138.   Plaintiff performed services for and under the control and direction of Defendant for wages.

139.   Plaintiff engaged in protected activity under Health Occupations Article, §1-502, *et seq.*

140.   Plaintiff disclosed or threatened to disclose to a supervisor or board an activity, policy, or practice of the employer that is violation of a law, rule or regulation.

141.   Plaintiff objected to and/or refused to participate in an activity, policy, or practice in violation of a law, rule, or regulation.

142.   Plaintiff had the reasonable, good faith belief that the Defendant was, or still are, engaged in an activity, policy, or practice that is in violation of a law, rule or regulation.

143.   Defendant's activity, policy or practice that is the subject of Plaintiff's protected activity posed a substantial and specific danger to the public health or safety.

---

[1] Following the filing of this District Court Complaint, Plaintiff is filing a demand for arbitration.  Plaintiff does not waiver her right to pursue Plaintiff's claims in Court.  Plaintiff is filing the demand for arbitration out of an abundance of caution to preserve any potential statute of limitations claims should the Court ultimately find this case subject to Arbitration under the Federal Arbitration Act.

144.    On March 5, 2020, Maryland declared a "State of Emergency" and the "Existence of a Catastrophic Health Emergency" related to the spread of the COVID-19 virus.  Maryland has declared COVID-19 an "immediate danger to public safety."

145.    Prior to Plaintiff's disclosures and termination, The Secretary of the U.S. Department of Health and Human services declared COVID-19 had created a public health emergency.

146.    As of March, 2021, Maryland had approximately 66,000 confirmed cases of COVID-19 and 1,500 deaths.

147.    As of March, 2021 there were approximately 30 million confirmed cases of COVID-19 in the United States resulting in over half a million deaths.

148.    COVID-19 and the spread of COVID-19 represents a substantial and specific danger to the public health or safety.

149.    The State of Maryland declared that it was a substantial and specific danger to the public health or safety to operate indoor facilities not in compliance with Social Distancing Guidance.

150.    Defendant took materially adverse actions against Plaintiff because of, in whole or in part, and/or motivated by Plaintiff's protected activity under the Act.

151.    Plaintiff has suffered damages as a result of Defendant's violation of the Act.

152.    Defendant's actions were willful and malicious.

153.    Plaintiff has suffered and continues to suffer substantial pecuniary and non-pecuniary damages.

154.    Plaintiff has suffered severe stress, anxiety and depression and other mental and physical anguish as a result of Defendant's actions.

155.   Defendant is subject to punitive damages and capable of paying a punitive damages award.

156.   For Count I, Plaintiff seeks damages, including: compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys fees, costs, injunctive relief, and any other civil relief as authorized by the Maryland Code, Health Occupations §1-502, *et seq.*

157.   Plaintiff seeks judgment on Count I in an amount in excess of $75,000.

## COUNT II – WRONGFUL TERMINATION IN VIOLATION OF MARYLAND PUBLIC POLICY

158.   Plaintiff hereby adopts and incorporates all aforementioned paragraphs as if herein stated.

159.   Defendant terminated Plaintiff in contravention of a clear mandate of public policy.

160.   The State of Maryland the United States have expressed clear mandates of public policies applicable to Plaintiff's employment.

161.   On March 5, 2020, Maryland declared a "State of Emergency" and the "Existence of a Catastrophic Health Emergency" related to the spread of the COVID-19 virus.  Maryland has declared COVID-19 an "immediate danger to public safety."

162.   Prior to Plaintiff's disclosures and termination, The Secretary of the U.S. Department of Health and Human services declared COVID-19 had created a public health emergency.

163.   As of March, 2021, Maryland had approximately 66,000 confirmed cases of COVID-19 and 1,500 deaths.

164.    As of March, 2021 there were approximately 30 million confirmed cases of COVID-19 in the United States resulting in over half a million deaths.

165.    COVID-19 and the spread of COVID-19 represents a substantial and specific danger to the public health or safety.

166.    The State of Maryland declared that it was a substantial and specific danger to the public health or safety to operate indoor facilities not in compliance with Social Distancing Guidance.

167.    The General Assembly has an announced that COVID-19 constitutes a state of emergency and the existence of a catastrophic health emergency.

168.    Maryland has a stated public policy to "protect the public peace, health, and safety in the State, to preserve the lives and property of the people of the State, and to ensure the social and economic resilience of the  Md. Public Safety Code §14-101, *et seq.*

169.    The United States declared a Public Health Emergency on January 31, 2020.

170.    On January 31, 2020, U.S. Department of Health and Human Services Secretary Alex M. Azar II declared: "As a result of confirmed cases of 2019 Novel Coronavirus (2019-nCoV), on this date and after consultation with public health officials as necessary, I, Alex M. Azar II, Secretary of Health and Human Services, pursuant to the authority vested in me under section 319 of the Public Health Service Act, do hereby determine that a public health emergency exists and has existed since January 27, 2020, nationwide." Moreover, Defendant violated the public policy expressed in the Stafford Act. The Act and the President's declaration authorizes the Federal Emergency Management Agency

(FEMA) to disburse disaster relief funds. On March 13, 2020 the President issued state-by-state major disaster declarations.

171. The State of Maryland the United States have expressed clear mandates of public policies applicable to Plaintiff's employment.

172. Plaintiff was suspended and/or terminated because of, in whole or in part, and/or motivated by her protected activity under the Wrongful Termination in Violation of Public Policy Doctrine and Plaintiff's termination constituted a violation of a clear public policy mandate.

173. Defendant took materially adverse actions against Plaintiff because of, in whole or in part, and/or motivated by Plaintiff's protected activity under the tort of Wrongful Termination in Violation of Public Policy.

174. Plaintiff has suffered damages as a result of Defendant's wrongful termination in violation of public policy.

175. Defendant's actions were willful and malicious.

176. Plaintiff has suffered and continues to suffer substantial pecuniary and non-pecuniary damages.

177. Plaintiff has suffered severe stress, anxiety and depression and other mental and physical anguish as a result of Defendant's actions.

178. Defendant is subject to punitive damages and capable of paying a punitive damages award.

179. For Count II, Plaintiff seeks damages, including: compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys fees, costs, injunctive relief, and any other civil relief as authorized by law.

180.    Plaintiff seeks judgment on Count II in an amount in excess of $75,000.

**COUNT III – RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, MD STATE GOVERNMENT ARTICLE §20-606, *et seq*  and the MONTGOMERY COUNTY CODE CH. 27-19**

181.    Plaintiff hereby adopts and incorporates all aforementioned paragraphs as if herein stated.

182.    Plaintiff engaged in protected activity under Md. State Government Article §20-606, *et seq*., the Montgomery County Code, Ch. 27-19 and the Age Discrimination in Employment Act.

183.    Plaintiff held the reasonable belief that she was opposing unlawful employment activity under the aforementioned statutes.

184.    Defendants were aware that Plaintiff was opposing what she reasonably believed was unlawful employment activity.

185.    Defendants retaliated against Plaintiff because of, in whole or in part, and/or motivated by her opposition activity in violation of Md. State Government Article §20-606, et seq.. the Montgomery County Code, Ch. 27-19, Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.

186.    Defendants violated Md. State Government Article §20-606, et seq. the Montgomery County Code, Ch. 27-19 and the Age Discrimination in Employment Act when Defendant's failed to pay Plaintiff a wage, suspended Plaintiff and terminated Plaintiff's employment.

187.    Plaintiff suffered adverse employment actions as the result of Defendants' retaliation.

188.    There is a causal connection between Plaintiff's protected activity and the adverse actions suffered by Plaintiff.

189.    Defendant acted because of or was motivated by Plaintiff's protected activity in causing Plaintiff to suffer adverse employment actions.

190.    Defendant retaliated against Plaintiff because of Plaintiff's protected activity.

191.    Defendant acted willfully and maliciously.

192.    Defendant did not make good-faith efforts to comply with any anti-retaliation policy.

193.    Defendant is subject to punitive damages and capable of paying a punitive damages award.

194.    Plaintiff has administratively exhausted all prerequisites to filing suit.   Plaintiff timely filed charges with the MCOHR, EEOC and MCCR.   More than 180 days have passed since the filing of said charges.

195.    For Count III, Plaintiff seeks damages, including: compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys fees, costs, injunctive relief, and any other civil relief as authorized by State and Federal law.

196.    Plaintiff seeks judgment on Count III in an amount in excess of $75,000.

**COUNT IV – AGE DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, MD STATE GOVERNMENT ARTICLE §20-606, *et seq* and the MONTGOMERY COUNTY CODE**

197.    Plaintiff hereby adopts and incorporates all aforementioned paragraphs as if herein stated.

198.   Defendants discriminated against Plaintiff on the basis of her age (over 40) in violation of Md. State Government Article §20-606, *et seq.* the Montgomery County Code, Ch. 27-19 and the Age Discrimination in Employment Act.

199.   Plaintiff was over the age of 40 at all times relevant to this complaint.

200.   Plaintiff is a member of a protected class.

201.   At the time that Plaintiff was suspended and/or terminated, Plaintiff was satisfactorily performing the functions of her position at a level that met the employers' expectations

202.   Defendant was motivated by Plaintiffs' age in making the decision to discipline, suspend and/or terminate Plaintiff.

203.   Plaintiff was suspended and/or terminated because of her age.

204.   Plaintiff suffered adverse employment actions because of her age.

205.   Upon information and belief, Plaintiff was replaced with someone outside of Plaintiff's protected class.

206.   Defendant's actions were willful and/or malicious.

207.   Plaintiff has administratively exhausted all prerequisites to filing suit.  Plaintiff timely filed charges with the MCOHR, EEOC and MCCR.  More than 180 days have passed since the filing of said charges.

208.   For Count IV, Plaintiff seeks damages, including: compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys fees, costs, injunctive relief, and any other civil relief as authorized by State and Federal law.

209.   Plaintiff seeks judgment on Count IV in an amount in excess of $75,000.

## COUNT V - VIOLATION OF MARYLAND WAGE PAYMENT
## AND COLLECTION LAW AND FAIR LABOR STANDARDS ACT

210.    The Plaintiff re-alleges and incorporates by reference all of the preceding and following paragraphs of this Complaint as though fully set forth herein.

211.    Plaintiff was owed a wage for work Plaintiff had completed while employed with Defendant.

212.    Defendant has failed to pay Plaintiff wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401 to 3-430, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 to 3-509.

213.    At the time Plaintiff was terminated (and since that time), Plaintiff's wages had been earned.

214.    Plaintiff was a non-exempt hourly employee under Maryland and Federal law.

215.    Defendant has refused to pay Plaintiff the compensation Plaintiff has earned for hours that Plaintiff worked.

216.    Defendant has refused to pay Plaintiff an hourly wage for hours that Plaintiff worked.

217.    Defendant has refused to pay Plaintiff an overtime wage for overtime hours that Plaintiff worked.

218.    As of the time of filing this lawsuit, this compensation has not been paid.

219.    Defendants' actions violate the Maryland Wage Payment and Collection Act, i.e., Section 3-501, *et seq* of the Maryland Labor and Employment Article.

220.    Plaintiff earned a "wage" as defined of the Wage Payment and Collection Act.

221. Defendant failed to pay Plaintiff a "wage."

222. Defendant has withheld Plaintiffs compensation not as a result of a bona fide dispute.

223. Defendants acted in bad faith.

224. As a result, Plaintiff is owed "treble damages" which equal three (3) times Plaintiff's earned wages.

225. Plaintiff is also entitled to reasonable attorney's fees and costs and prejudgment interest.

226. Defendant failed to pay Plaintiff a minimum wage and/or overtime for all hours that Plaintiff worked pursuant to Maryland and federal law.

227. For Count V, Plaintiff seeks damages, including: compensatory damages, punitive damages, pre-judgment interest, post-judgment interest, attorneys fees, costs, injunctive relief, and any other civil relief as authorized by State and Federal law.

228. Plaintiff seeks judgment on Count V in an amount in excess of $75,000.


**JURY DEMAND**

229. Plaintiff demands a trial by jury on all counts.


Respectfully submitted,


*__Daniel E. Kenney, Esq.__*
Daniel E. Kenney, Esq.
Bar No. 18369
DK Associates, LLC
5425 Wisconsin Avenue, Suite 600
Chevy Chase, MD 20815
202-430-5966 Phone
dan@dkemployment.com

Attorney for Plaintiff